## ROCKEFELLER v. MERRITT.

(Circuit Court of Appeals, Eighth Circuit. November 9, 1896.)

No. 707.

1. CONSTRUCTION OF CONTRACTS.

In the construction of a contract the court may put itself in the place of the contracting parties, and then, in view of all the facts and circumstances surrounding them at the time the instrument was executed, consider what they intended by the terms of their contract. When the intention is manifest after such consideration, it will control in the interpretation of the instrument, regardless of careless recitals or inapt expressions.

2. SAME—EXCHANGE OF STOCKS AND SECURITIES.

Parties to an agreement for the exchange of mining and railway stocks and securities of various corporations for the bonds and stock of a new corporation agreed in the contract upon the values at which the exchanges should be made. *Held*, this agreement did not constitute a contract that the stocks, bonds, and securities were of the actual market values specified in the contract.

**3. MEASURE OF DAMAGES—BREACH OF CONTRACT.**
    The true measure of the damages suffered by one who is fraudulently induced to make a contract of sale, purchase, or exchange of property is the difference between the actual value of that which he parts with and the actual value of that which he receives under the contract.

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the District of Minnesota.

Geo. Welwood Murray and Cushman K. Davis (John M. Shaw and Joseph B. Cotton with them on the brief), for plaintiff in error.

A. A. Harris and J. L. Washburn (Henry E. Harris and O. W. Baldwin with them on the brief), for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge, delivered the opinion of the court.

This writ of error challenges a judgment of $940,000 against John D. Rockefeller, the plaintiff in error, for fraudulent misrepresentations of the financial standing of two mining corporations, which induced Alfred Merritt, the defendant in error, to make and perform a contract to exchange certain stocks in several corporations for stock in a single corporation. The contract was made on August 28, 1893. The parties to it were Alfred Merritt, 10 other gentlemen named Merritt, some of whom were his brothers, and Charles W. Wetmore, parties of the first part, John D. Rockefeller, party of the second part, and the Lake Superior Consolidated Iron Mines, a corporation, party of the third part. For the sake of brevity, Alfred Merritt, who was the plaintiff in the court below, will be called the "plaintiff"; John D. Rockefeller, the "defendant"; the Lake Superior Consolidated Iron Mines the "Consolidated Mines"; the Penokee & Gogebic Consolidated Mines, a corporation, the "Penokee Corporation"; and the Spanish-American Iron Company the "Spanish Company."

The plaintiff, Merritt, alleged in his complaint that he was the owner of certain shares of stock in certain mining corporations and in a railway corporation, which were of the reasonable and agreed value of $1,533,000; that the defendant, Rockefeller, was the owner of certain stocks, bonds, and notes of the Penokee Corporation and of the Spanish Company; that Rockefeller falsely and fraudulently represented to him that these two corporations were solvent and prosperous, and owed little above their funded indebtedness, and thereby induced him to enter into the contract of August 28, 1893, to the effect that he would convey his stocks, for certain prices specified in the contract, to the Consolidated Mines, a new corporation, and take in payment therefor stock in that corporation at 50 per cent. of its par value, and that this new corporation would take the stocks, bonds, and notes of the Penokee Corporation and of the Spanish Company and certain other securities held by Rockefeller at the prices named in the contract, and pay him for them with its bonds at 90 per cent. of their par value, secured by a mortgage on all its property. He alleged that this agreement was performed, and that he received 30,660 shares of the stock of the Consolidated Mines,

of the par value of $3,066,000, in exchange for his stocks, which were of the reasonable and agreed value of $1,533,000, but that these shares of stock in the Consolidated Mines were not worth more than 10 per cent. of their par value, or more than $306,600; and that in this way he was damaged by the fraudulent representations of the plaintiff in error in the sum of $1,226,000. The defendant answered this complaint. He denied that he made any of the alleged representations; denied that the plaintiff was induced to make the contract by any such representations; denied that he, the defendant, ever agreed that the stocks of the plaintiff were of any stated or particular market value whatever; and denied any knowledge or information as to the value of his stocks in his original corporations, or as to the value of his stock in the new corporation. He alleged that about four months after the contract of August 28, 1893, was made, he first learned that the Penokee Corporation and the Spanish Company were financially embarrassed, and that he thereupon returned to the Consolidated Mines its bonds to the amount of $2,799,000, and took in exchange for a portion of these bonds, which amounted to more than $2,000,000 at their par value, the stock of the Consolidated Mines at its par value, which was then worth but 10 per cent. of that value.

It is assigned as error that the court below refused to permit the defendant to prove that the stocks which the plaintiff exchanged for the stock of the Consolidated Mines were in fact of no greater value than the latter, refused to permit him to show their actual value at all, and charged the jury that the measure of plaintiff's damages was the difference between the values at which the plaintiff's stocks were estimated in the contract of exchange of August 28, 1893, and the actual market value of the stock of the Consolidated Mines which he received in exchange for them. A brief reference to the facts presented at the trial below which were material to this question of damages is requisite to a full appreciation of the character and effect of these rulings. Prior to August 28, 1893, the Merritts owned stocks in several mining corporations, which either had title to or leasehold interests in actual or prospective mines on the Missabe Range in Minnesota, and they also owned stock in a railway corporation, which had a railroad from Duluth, Minn., to that range. The defendant had some shares of stock and some trust notes of the Penokee Corporation, some shares of stock and some bonds of the Spanish Company, and some shares of stock and some bonds of certain other corporations whose names are not material here. For about two months the Merritts and the defendant had been negotiating and contracting with a view to perfect and carry out a plan by means of which the Merritts might vest the title to all their stocks in their various mining corporations and their stock in the railway company in a single corporation, to be controlled by themselves, might have that corporation give each of the Merritts a just amount of its stock at 50 per cent. of its par value in exchange for his stocks in these original corporations, and might have the new corporation take the stocks and bonds of the defendant, and give him its bonds in exchange for them at 90 per cent. of their par value, secured by a mort-

gage upon all its property. The Consolidated Mines was the new corporation which was formed to take these various securities. The interests of the individuals who composed the Merritts in the stocks which they proposed to convey to this corporation were various. Some of them owned stocks in some and none in others of their corporations, which were to be controlled by the Consolidated Mines. Some owned large shares of the stocks of one or two of the corporations, and small shares or none in the others. Some of the stocks were very valuable, and some of them were of little value. As they proposed to convey all these stocks to the new corporation in exchange for its stock, it became necessary for them to fix the relative values of the stocks in their corporations in order to determine the relative amount of the stock in the new corporation which each of them should receive. Since the amount of this stock which each of the Merritts would receive depended upon the relative value of the stock which he held in the original corporations to the value of that held by all the Merritts, he was deeply interested in the decision of this question. But, as Rockefeller was to have a mortgage on all the property of the new corporation for the price of his securities, it was not so important to him what relative or estimated values were placed upon the securities which the Merritts were to put under his mortgage. When the question of the values of the stocks held by the Merritts arose, the defendant informed them that he would leave the determination of that matter to them, and directed them to put their own cash valuation on their property and on certain property upon the Missabe Range that was to go into the consolidation upon which he held options to purchase from the Merritts. Thereupon they made estimates of the values of their various stocks, and wrote a letter to the agent of the defendant in which they set them forth. The values fixed by this letter were taken as the basis of the issue of the stock of the new corporation to the individual members of the Merritts, and were carried forward into the contract of August 28, 1893, with the approval of the defendant, and without change, except that the relative value of the stock of one of their corporations, for the purchase of which the defendant had a prior contract or option, was raised $200,000. The contract provided that the Consolidated Mines should acquire the mining stocks of the Merritts at the rates named in the letter and recited in the contract, that it should pay for them with two dollars of its own stock for one dollar of these values, that it should acquire the securities of the defendant at the prices which were specified in the contract and which in the main he had fixed, and that it should pay him for them with its mortgage bonds at 90 per cent. of their par value. The first article reads:

"Messrs. Merritt & Wetmore and the Consolidated Mines covenant and agree that the Consolidated Mines will forthwith acquire the following named interest in the following mentioned properties, hereinafter set forth, to wit: Sixty-one (61) per cent. of the capital stock of the Mountain Iron Company, at the rate of three million five hundred thousand dollars for the entire property,"

—And then follows in the same article the description of the other stocks to be acquired from the Merritts, with the exception of the stock of the railway company, and the rates at which they were to be

taken in exchange for the stock of the new corporation. The third article, without an exception which it contains, which is not material to the question of damages, reads:

"The Consolidated Mines will pay for the properties above mentioned in its capital stock at the rate of fifty per cent. of the par value thereof; that is to say, two dollars of such capital stock for every dollar of cash valuation as stated above."

The only valuation stated above consisted of the rates at which the stocks of the Merritts were to be taken by the Consolidated Mines, to which reference has been made. The allegation of the plaintiff that he was induced to make this contract by the false and fraudulent representations of the defendant as to the financial standing of the Penokee Corporation and the Spanish Company, and that the securities of those companies were in fact worthless, was supported by some evidence, and for the purposes of this discussion will be taken as established. The contract was performed. Bonds of the Consolidated Mines to the amount of $1,699,851, payable in 10 years, with 6 per cent. interest, were issued to the defendant for his stocks, trust notes, and bonds of the Penokee Corporation and the Spanish Company, and for $2,599,149 for his other securities, about which no complaint is made; so that the mortgage indebtedness of the Consolidated Mines became $4,299,000. These bonds were secured by a first mortgage on all the property of the new corporation. In January, 1894, the Penokee Corporation and the Spanish Company were financially embarrassed, and on January 18, 1894, the defendant surrendered to the Consolidated Mines its first mortgage bonds of the par value of $2,146,505.34, and took in exchange for these bonds and their accrued interest stock of the corporation at its par value, although it was then worth but 10 per cent. of that value. Bonds to the amount of $1,699,851 of those so surrendered had been issued on account of the securities of the Penokee Corporation and the Spanish Company, and the balance on account of the securities about which no complaint is made. At the same time the defendant took back from the Consolidated Mines 640 shares of the West Superior Iron & Steel Company, which he had sold to that corporation under the contract of August 28, 1893, and surrendered to it its first mortgage bonds of the par value of about $652,800, which he had taken therefor. In this way the mortgage indebtedness of the Consolidated Mines was reduced in January, 1894, from about $4,299,000 to about $1,500,000. In February, 1894, the Merritts sold a large portion or all their stock in the Consolidated Mines to the defendant at its market value, which was then 10 per cent. of its par value. During all this time, until the sale of this stock in February, 1894, the plaintiff had continued to own the stock in the Consolidated Mines which he obtained under the contract of August 28, 1893, the president of that corporation and a majority of its directors had been members of the Merritts, and they had held a majority of its stock. Its board of directors had in January, 1894, unanimously adopted the resolutions which authorized the issue of the stock of the corporation, and its exchange at par for the bonds and accrued interest which the defendant had received for the securities of the Penokee Corporation and the Spanish Com-

pany, and which authorized the reduction of its mortgage indebtedness by this and other exchanges of securities from $4,299,000 to $1,500,000. During all this time, as far as the record discloses, the market value of the stock of the Consolidated Mines was 10 per cent. of its par value. The Consolidated Mines issued its stock under the contract of August 28, 1893, to the amount of $21,000,000, and the property it received for this stock, reckoned at the rates specified in the contract, was worth 50 per cent. of that amount, or $10,500,000. Upon this record the plaintiff was induced by the false representations of the defendant to take stock in the new corporation to the amount of $2,967,632, and to part with stocks in his original corporations which, at the rates specified in the contract, were worth 50 per cent. of the amount of this new stock, or $1,483,816. The stock he received in the Consolidated Mines was actually worth but 10 per cent. of its par value or $296,763.20. The defendant offered and was refused permission to prove that the actual value of the stocks which the plaintiff gave for his stock in the Consolidated Mines was no greater than the value of the stock he received, namely, $296,763.20. For the purposes of this discussion, the statement contained in this offer must now be deemed to be the fact. Scotland Co. v. Hill, 112 U. S. 183, 186, 5 Sup. Ct. 93. Under this state of facts, the effect of the rulings of the court below upon the question of damages was that, if the jury found the deceit to be proved, as they did, the plaintiff was entitled to recover the difference between the value of his original stocks at the rates specified in the contract, $1,483,816, and the actual value of the stock of the Consolidated Mines which he received, $296,763.20, or $1,186,042.80, notwithstanding the fact that the actual market value of the plaintiff's original stocks was never more than the actual value of the stock in the new corporation which he received for them. Their effect was to permit the plaintiff to recover of the defendant as damages, if the jury saw fit to allow as much, four times the actual market value of all the property he had parted with, because, in an agreement for the exchange of stocks, the parties had stated its value for the purposes of the exchange, at five times its actual value. Can these rulings be sustained?

The true measure of the damages suffered by one who is fraudulently induced to make a contract of sale, purchase, or exchange of property is the difference between the actual value of that which he parts with and the actual value of that which he receives under the contract. It is the loss which he has sustained, and not the profits which he might have made by the transaction. It excludes all speculation, and is limited to compensation. Smith v. Bolles, 132 U. S. 125, 10 Sup. Ct. 39; Busterud v. Farrington, 36 Minn. 320, 31 N. W. 360; Reynolds v. Franklin, 44 Minn. 30, 32, 46 N. W. 139; Stickney v. Jordan, 47 Minn. 262, 49 N. W. 980; Fixen v. Blake, 47 Minn. 540, 542, 50 N. W. 612; Wallace v. Hallowell, 56 Minn. 501, 58 N. W. 292; Woolenslagle v. Runals, 76 Mich. 545, 43 N. W. 454; McAleer v. Horsey, 35 Md. 439; Buschman v. Codd, 52 Md. 202, 209; High v. Berret (Pa. Sup.) 23 Atl. 1004. These propositions are unquestioned, and counsel for the plaintiff insist that they were prop-

erly applied to measure the damages in this case. They maintain that the plaintiff and the defendant agreed by the contract of August 28, 1893, that the actual value of the plaintiff's original stocks was an amount of money which was equal to 50 per cent. of the par value of the new stock which he received, or to $1,483,816, and that the defendant is thereby estopped from proving any other value for them in this action. But there can be no binding contract be-tween parties unless their minds meet and assent to the terms of the agreement. Did the minds of the parties to the contract of August 28, 1893, ever meet or assent to the proposition that the property described therein was of the actual market value there specified on a sale of it for cash, or that any of them would pay for any of it at the rates there named in money or its equivalent, either under the contract or otherwise? One of the most satisfactory tests to ascertain the true meaning of a contract is made by putting ourselves in the place of the contracting parties when it was made, and then considering, in view of all the facts and circumstances surrounding them at the time of its execution, what the parties intended by the terms of their agreement. When their intention is thus made clear it must prevail in the interpretation of the instrument regardless of inapt expressions or careless recitals. Accumulator Co. v. Dubuque St. Ry. Co., 27 U. S. App. 364, 372. 12 C. C. A. 37, 41, 42, and 64 Fed. 70, 74. Let us apply this test to this contract. It is true that in the antecedent negotiations, in the letter by which the Merritts estimated the value of their property, and in the contract itself the parties sometimes referred to the values which they fixed as cash valuations, and as the amounts at which they would be willing to buy or sell the property; but it is also true that the letter by which the values of the original stocks of the Merritts were fixed declares in express terms that the signers have "tried to place a relative value on each of the mines," that the values there stated are their "estimate of what the different properties ought to bring in the consolidation," and that the contract itself is not in terms that these properties were worth the amounts there stated, but that the Consolidated Mines would acquire the stocks described at the rate of the values there recited, and pay for them in its own stocks at 50 per cent. of their par value. None of the parties to the contract were buying or selling or contemplating the purchase or sale of any of these securities for cash or its equivalent. The defendant was not buying or intending to buy any of the stocks or property of the Merritts. They were not selling or intending to sell their stocks under this agreement. They were simply exchanging the stocks which they owned in several corporations for stock in a single corporation, which they intended to control, and which was to own the same property that they then held and more. The defendant was not selling and the Merritts were not buying his securities for cash, but he was simply exchanging them for mortgage bonds of the new corporation, which the Merritts were to control, payable in 10 years from their date, with interest at 6 per cent. per annum. Here, then, were the promoters of a new mining corporation, fixing values at which one set of parties would exchange their individual stocks in several

corporations for $21,000,000 of stock in the new corporation, and the values at which their new corporation would exchange its 10-year bonds to the amount of $4,299,000 for the securities of another party. Undoubtedly, they might have found and agreed what the market values of all these securites were on a sale for cash, and they might have contracted that these securities should be deemed of the values which they stipulated in all controversies that should subsequently arise under the agreement. But casual expressions and loose recitals cannot be permitted to establish such a contract. Nothing short of a plain stipulation to that effect ought to be permitted to prove it, in view of the fact that the determination of actual values was not necessary to the completion of the pending negotiations. There is no such express stipulation in the contract. The finding of the actual market value of these securities was not the object which the parties sought to accomplish by, or the intention with which they fixed the values specified in, the contract. They did not intend or attempt to fix the values of the securities of the Merritts in cash, but their values in the stock of the Consolidated Mines at 50 per cent. of its par value. They did not intend or attempt to fix the values of the securities of the defendant in money, but their value in 10-year bonds of the Consolidated Mines at 90 per cent. of their face. In view of the situation of the parties to this contract when it was made, their surrounding circumstances, the object which they were seeking to attain, and the terms of the letter and of the agreement, it is plain to us that this was the extent of their contract as to the values of the stocks which they described in it. The evidence convinces us that their minds never considered or met upon the question of the actual market value of any of these securities, and that they never intended to, and never did, make any binding agreement upon that subject. The defendant, therefore, did not contract that the market value of the plaintiff's stocks was $1,483,816 in cash, or in anything but the stock of the Consolidated Mines at 50 per cent. of its par value.

Was he estopped from proving its actual market value? He was not estopped by any agreement as to that value, because, as we have seen, he had made no such agreement. An estoppel in pais arises when one who is ignorant of the material facts which condition a subject is intentionally or recklessly induced by the false representations or action of another to change his relation to it, so that he will be injured if he who made the false representations is permitted to prove the truth. If a vendor represents to a purchaser that a tract of land contains 10 acres more than it actually measures, and thereby induces him to buy and pay for it at the rate of $30 per acre, he is estopped from showing that the land was of less value, because the purchaser has actually paid and lost $30 per acre upon the 10 acres that did not exist. If the plaintiff had induced the defendant to purchase some of his property for cash by false representations, he would have been estopped from denying that such property was worth what the defendant had actually paid for it, because that would have been his actual loss. But there is nothing of this kind in the case in hand. The plaintiff was not ignorant of the actual value

of his own stocks. He was not misled or induced to make the contract by any misrepresentations of the defendant on that subject. The defendant made no representations as to the values of the plaintiff's original stocks, and he and his associates fixed their own estimates of these values, and they were embodied in the contract. The evidence relative to these values presents none of the essential elements of an estoppel in pais.

The difficulty with the rule applied by the court to measure the damages in this case seems to be its failure to note the difference between the actual value of the plaintiff's stocks and the value at which they were estimated in the contract for the exchange of securities. In a simple transaction this difference seems clear and radical. If A., by the false representation of good title to a lot that is actually worth $1,000, induces B. to give him a lot of the same value in exchange, B.'s damages must be the actual value of the lot which he conveys. If in their contract of exchange of the lots and in their deeds they estimate and recite the value of each lot at five times its actual value, that fact cannot multiply or increase the damages of B. He loses no more than the $1,000, the actual value of the lot he parts with. As long as he accepts A.'s lot in payment for his, he may be permitted to maintain that his lot paid the debt of $5,000 which he incurred to A. for the latter's lot, because that was the contract. But the moment he brings his suit for damages, and thereby undertakes to collect the value of his lot, or any part of it in money, instead of in land, he is limited to its actual market value and to his actual loss. The extent of the defendant's agreement as to the value of the plaintiff's stocks was that they were worth $1,-483,816 in the stocks of the Consolidated Mines at 50 per cent. of their par value, in consideration that the plaintiff agreed that the defendant's securities were worth $4,299,000 in first mortgage bonds of that corporation at certain percentages of their par value. As long as the plaintiff was content to pay the defendant for his securities in these bonds, and to accept the stocks of the new corporation for his original stocks, these estimated values stood. But when, in this suit for damages, he undertakes to convert a part of the payment for his original stocks from stock of the Consolidated Mines into money, he must be limited in his recovery to the actual market value of his original stocks in cash, and thus to the actual loss he has sustained. In an action for damages for material misrepresentations which induce an exchange of property, the difference between the actual market value of the property which is parted with and the actual market value of that which is received under the contract, and not the difference between the price of the property parted with fixed in the agreement of exchange and the actual value of that received, is the true measure of the damages. Reynolds v. Franklin, 44 Minn. 30, 32, 46 N. W. 139; Fixen v. Blake, 47 Minn. 540, 542, 50 N. W. 612; High v. Berret (Pa. Sup.) 23 Atl. 1004. The disregard of this rule resulted in a recovery which violated the fundamental principles by which damages are measured in actions of this character. One of these is that such damages must be merely compensatory, and must not be speculative. The defendant was

bound to make good to the plaintiff the actual loss which the latter had sustained by reason of his misrepresentations, but he was not required to pay him his estimated or expected prices for his stocks, if these prices were higher than the actual value of his property. The injury was that the Consolidated Mines was caused to issue its first mortgage bonds for $1,619,851 for worthless property, and thereby the value of the stock of the plaintiff in this corporation was depreciated in value, and in this way he was damaged. Obviously, the Consolidated Mines must have been damaged before the plaintiff could suffer from this cause, and he could suffer no greater damage than such a part of that which the corporation suffered as his stock was of the entire amount of the stock issued by that corporation. Suppose that the defendant's securities in the Penokee Corporation and the Spanish Company were worthless, and that the Consolidated Mines issued its bonds for them to the amount of $1,619,851, what loss did it sustain? What would fully compensate it for this loss? If the corporation had actually paid $1,619,851 for these worthless securities, it is clear that the repayment of that amount would completely compensate it for its loss. It could not suffer any greater loss by promising to pay this amount and never paying it. The plaintiff had less than one-seventh of its stock, and his share of full compensation for this injury could not possibly have been more than one-seventh of $1,619,851 and interest, or $231,407.28 and interest. But he recovered a verdict for $940,000, and this recovery imports a damage to the corporation of at least $6,580,000 for issuing bonds for $1,619,851. In our opinion, these damages far exceeded the just measure of full compensation for this injury. They could not have been limited to the actual loss, but must have consisted in large part of the difference between the sanguine estimates of the values of mining and railway stock made by their owners for the purposes of exchange and the actual values of those stocks. They must have been composed more largely of bright anticipations of prices which the owners of the stocks hoped to realize from them than of the difference between the actual values of the stocks which were exchanged. In other words, they were speculative rather than compensatory damages.

Another universal rule for the ascertainment of damages in cases of this character is that they must be the natural and proximate consequence of the injury. They may not be so remote that the wrongdoer might not have reasonably expected them under the circumstances of the particular case. Jex v. Straus, 122 N. Y. 293, 301, 25 N. E. 478; 1 Suth. Dam. 21; 1 Sedg. Dam. (8th Ed.) § 142; 2 Greenl. Ev. § 256; 1 Add. Torts, 6; Ryan v. Railroad Co., 35 N. Y. 210; Knight v. Wilcox, 14 N. Y. 413, 416; Hutchins v. Hutchins, 7 Hill, 104; Lynch v. Knight, 9 H. L. Cas. 577. Who could have reasonably expected that the fraudulent increase of the mortgage indebtedness of a corporation that had issued stock to the amount of $21,000,000 from $2,579,149 to $4,299,000 would injure the corporation and depreciate the value of its stock $6,580,000, or more than four times the increase of its mortgage debt? Who could have anticipated such an amount of damages as the natural or probable result

of an injury that would have been fully compensated by the payment of less than one-fourth of that amount to the corporation? These questions seem to us to be susceptible of but one answer. We are convinced that damages so enormous could not have been reasonably expected to follow from, and could not have been the natural or probable consequence of, so relatively small an increase of the mortgage debt of so gigantic a corporation. This view is confirmed by the fact that the reduction of the mortgage debt of this corporation more than $2,000,000 by an exchange of its first mortgage bonds and accrued interest for its stock at par in January, 1894, did not appreciate or change the market value of this stock by as much as 1 per cent. of its par value.

The errors in the rulings of the court below relative to the measure of the plaintiff's damages, which we have been considering, are fatal to this judgment, and necessitate a retrial of the case. There are many other assignments of error, and they present many interesting questions, but their consideration and decision would not change the conclusion at which we have arrived. The judgment below must be reversed, with costs, and the case must be remanded to the court below, with directions to grant a new trial; and it is so ordered.