## LEETE v. PACIFIC MILL & MINING CO.

### (Circuit Court, D. Nevada. July 5, 1898.)

### No. 651.

1. Money Had and Received—Promise Implied from Legal Duty.
   If one receives a payment from the government, to which another is legally entitled, as between themselves a promise to pay it over is implied, and an action for money had and received will lie for its recovery.

2. Public Lands—Cancellation of Entry—Right to Money Refunded.
   As between an entryman and a subsequent grantee, who is in possession, claiming through him, at the time the entry is canceled, the grantee is entitled to the purchase money refunded by the government.

3. Same—Reservation in Deed.
   Plaintiff conveyed his interest in the property of a partnership in the hands of a receiver, reserving any interest he might have in any money or accounts in the hands of the receiver. The property consisted in part of land which had been entered at the land office, and the purchase price paid. Several years after, when the land was in the possession of a subsequent grantee, the entry was canceled by the government, and the purchase money returned to the grantee. *Held*, that the reservation in plaintiff's deed did not apply to such purchase money.

4. Contract—Construction by Parties.
   Where a contract for the sale of property, made by correspondence, was ambiguous as to whether the seller's interest in a claim against the government in relation to the property was to pass, the conduct of the

parties in relation to the claim immediately following the making of the contract is admissible to show their understanding.

5. SAME—ESTOPPEL.
   Where the understanding of the meaning and effect of a contract, with which it was executed by one of the parties, was known to the other, who made no objection thereto, the latter is estopped to afterwards claim a different construction, to his own advantage, and the detriment of the other party.

This is an action for money had and received. The allegation in the complaint is "that on or about the 1st day of May, 1896, the defendant received from the government of the United States the sum of $3,200, to and for the use and benefit of the plaintiff." The answer of the defendant admits the collection of the sum of $3,200 from the government, but denies that the money, or any part of it, was received "to or for the use or benefit of said plaintiff," and denies "that the whole or any part thereof is now, or ever was, due to said plaintiff." The action is based upon certain negotiations between the respective parties concerning the sale and purchase of the land and property situate in Churchill county, Nev., known as the "Eagle Salt Works," containing 1,280 acres of land, and including all the salt and all other personal property and improvements upon said premises.

The facts elicited at the trial are substantially as follows: In 1877 the plaintiff and C. H. Van Gorder, having previously acquired the possessory right to the land in question, applied, through the proper land office, for a patent thereto from the United States, and paid to the proper officers the sum of $3,200 for said land. Thereafter, in January, 1878.—the property in the meantime having been placed in the possession of a receiver.—the plaintiff conveyed his undivided one-half interest therein to W. N. Leete. The deed contained this reservation: "But it is not intended hereby to convey or transfer any interest which party of the first part has or may have to any moneys or accounts in the hands of such receiver, as receiver." On the same day W. N. Leete conveyed the property to the defendant herein, with the same reservation. In March, 1880, the defendant acquired, by deed, the interest in the property of the estate of C. H. Van Gorder, deceased. The application for a patent to the land was canceled by the land department in 1890. In the fall of 1894 negotiations were commenced between the parties hereto with reference to the plaintiff purchasing the property. All of the negotiations were by correspondence. The first was a letter from plaintiff to John W. Mackay, the president of the defendant corporation. D. B. Lyman was at the time of the correspondence the superintendent and managing agent of defendant in the state of Nevada. In February, 1895, plaintiff addressed a letter to Mr. Lyman, saying: "In December my son * * * wrote me that you wished to sell your Eagle Salt Works property for cash; also, that you wished to engage salt for your own mills. Kindly please state your price." On the same day Mr. Lyman sent a reply stating: "Whilst I am not prepared to give you a positive answer, as the matter must be submitted to Mr. Mackay for his approval, I think you can purchase the property, with all salt on hand, etc., and all personal property at the works, for $6,000; we reserving the right, and you guarantying to furnish us with salt for our own use, f. o. b. cars at works, for $4 per ton. We could not agree to take any stated number of tons, as our present consumption amounts to very little, but we do want reserved rights for mill salt at the stated price. We have on hand: Mill salt, 803 tons; table, 96; stock, 46 tons." On February 21, 1895, the plaintiff wrote to Mr. Lyman, stating that he did not consider the property a desirable investment at the price of $6,000, but said: "If we can agree on a price, I will buy." On February 23d Mr. Lyman answered: "I would suggest that you write me, or address Mr. Mackay through me, stating the price you are willing to give for the Eagle Salt Works property. I will forward your paper to him, and await his decision. I have advised

Messrs. Mackay and Flood to sell the property for $6,000; knowing the money paid the government for the land can be recovered, and assuming that the Eagle Salt Works property, with its supplies, salt on hand, etc., is worth at least $3,000." On February 26th the plaintiff wrote to Mr. Lyman as follows: "Replying to yours of the 21st, as to the value of the Eagle Salt Works property depending on the recovery of the purchase money from the government, who recovers from the government must deed to the government. and abandon all claim to the land, and surrender the receiver's receipt. It is not likely that any person desirous of claiming and holding title to land would solemnly file and record an abandonment. Besides, when I deeded to W. N. Leete I reserved all moneys of account. If I ever owned one-half of that money, I own it now. As you suggest, I will address Mr. Mackay through you." On March 28th plaintiff wrote to Mr. Mackay, reciting the substance of the former letters between himself and Lyman, and then made the following offer: "For a bargain and sale deed and possession of your Eagle Salt Works property, as it stands, I will give you, in gold coin, $3,500; also, at my expense and charge, furnish and load to your order at any time within five years, without charge to you, f. o. b. cars, in car-load lots, in bulk, at Eagle Salt Works, 945 tons of mining salt, of like quality to that now on hand. This agreement to bind myself, heirs, and assigns. You put deed in escrow, Bank of Nevada, and I will meet it with $3,500, and agreement to load as above. You put me in possession of the property." This letter was sent to Mr. Lyman, and plaintiff received a reply stating that he had forwarded the letter "to Mr. J. L. Flood, S. F., and he will then forward the letter to Mr. Mackay, or make known to him by wire the contents of your letter. When I know whether they accept or decline your offer, I will advise you further in the matter." On April 4th Mr. Lyman addressed the following letter to the plaintiff: "Your letter to Mr. Mackay, dated 28th of March, has been received, and its contents have been fully noted and considered. Your proposition is fully understood and satisfactory, with the exception of one point, which is open to doubt, and liable to be construed in more than one way, viz. the matter of your furnishing salt to us after sale of the property. I will condense the terms of the proposition as we understand them, in this way: In consideration of the sum of $3,500, gold coin, we will give you a bargain and sale deed of the land as described in the deed from Mr. W. N. Leete to the Pacific Mill & Mining Company, together with all the improvements thereon, including all the salt and other personal property of whatsoever character upon and connected with the Eagle Salt Works (there is now, by estimate, 875 tons of salt on the premises, more or less): provided, that you will furnish and load, at your own expense and charge, to the order of the Pacific Mill & Mining Company, or the Comstock Mill & Mining Company, in car-load lots, in bulk, at Eagle Salt Works, mil'l salt of like quality of that now on hand, from time to time, not to exceed 875 tons in all, within five years from date, at four dollars per ton. We do not obligate ourselves to order or to take any stated quantity of such salt. If these terms are satisfactory to you, please let me know, and immediate steps will be taken to have the deed and agreement made out, and to complete the transaction." On April 5th, Mr Leete addressed a letter to Mr. Lyman, accepting his offer, in words as follows: "Replying to yours of the 4th inst., the terms as stated in your letter are entirely satisfactory, and accepted by me. I am ready. As soon as you have your deed and agreement ready, advise me, and I will come up and complete the transaction." This ended the negotiations between the parties as to the sale. The deed from the corporation to Leete was executed April 9th, in pursuance of a resolution of the board of directors. It recites a consideration of $3,500, which was paid, and the further consideration as to the delivery of the salt as specified in the letter of Mr. Lyman. The deed is a quitclaim, instead of a bargain and sale, deed, but in all other respects it complies in terms with the result of the negotiations above expressed.

The plaintiff offered evidence to show what action had been taken by him to recover the money from the government that had been paid into the land office upon the application for a patent, and what steps were taken by the corporation, and the transactions and correspondence between the parties

in that regard. The defendant admitted that it had applied to the government for the sum of $3,200, and had received the money; that plaintiff had demanded the money from it, and payment had been refused; but interposed objections to all this class of testimony, upon the grounds that it was irrelevant and immaterial unless some new consideration was shown; the contention on the part of defendant being that the rights of the parties were fixed by the correspondence with reference to the sale. The plaintiff admitted that there was no new consideration, but contended that the subsequent transactions corroborated and made clear the fact that the parties dealt with each other on the basis that the money in the United States treasury was an element of consideration in the sale of the Eagle Salt Works to the plaintiff by the defendant. The court declined to pass upon the admissibility of this evidence, but admitted it subject to the objections which would be considered and disposed of in the determination of the case.

Mr. Leete employed Britton & Gray, at Washington, to collect this money from the government, and was informed by them that there was a law which prohibited the assignment of an account against the United States treasury, and that it would be necessary for him to proceed in the name of the corporation defendant, as the title to the property was in it at the time of the cancellation of the entry, in 1890, and requested him to get a power of attorney from the corporation authorizing them to act for it in obtaining the money for him. There was considerable correspondence and several interviews between the parties on this subject. The first was a letter from Mr. Leete to Mr. Lyman, dated July 31, 1895, as follows: "I want to try and collect from the government the money I paid on application to enter the Eagle Salt Mine claim in February, 1877. To that end I have employed Britton & Gray, attorneys, who did my business in 1877. They advise me that, under the law and usages of the land department, it is desirable to have a power of attorney from the Pacific Mill & Mining Company; also, our joint application from them for repayment of the Van Gorder interest, as they held that interest from about 1879 to cancellation of the entry, 1890, and until conveyed to me. I inclose you the papers that Messrs. Britton & Gray have sent me, to be executed by the Pacific Mill & Mining Company. Kindly please have them executed, and return to me. I will file with the papers a correct abstract of title from the county recorder of Churchill county." Some time after this, Mr. Leete discussed the matter with Mr. Lyman, in San Francisco. From their conversation, Mr. Leete understood that Mr George R. Wells was the attorney for the corporation; but, as a matter of fact, he was only the vice president of the corporation. Lyman accompanied Mr. Leete to Wells' office, and introduced him, and then retired. Mr. Leete testified that Mr. Wells then said to him: "Our company has not a cent's interest in this matter, and, if we execute a power of attorney to Britton & Gray to proceed in our name, they will presume that we are involved in an obligation to pay their attorney's fees. If you will get Britton & Gray to address us a letter disavowing any claim on us for their services as attorneys, we will execute the power of attorney asked for." Mr. Wells testified that this statement was substantially correct, except it leaves out the word "if"; that what he said was, "If our company has not a cent's interest," etc. Mr. Leete wrote to Britton & Gray, and they returned a letter to the secretary of the defendant, that "we have no present or prospective claim upon the Pacific Mill & Mining Company for payment for our services in this matter." Upon receipt of this communication, Mr. Leete forwarded the same to George R. Wells, in a letter dated August 27, 1895: "I am this day in receipt of the inclosure from Britton & Gray, addressed to L. C. Fraser, secretary of the Pacific Mill & Mining Company, disclaiming any claim on you for services in the case. I send it to you, as I have never met Mr. Fraser. Please have the two papers executed properly, and sent to me, to wit, the power of attorney; also, the application for repayment of purchase money. Under the statutes of the United States, in such cases as this we have to proceed in this manner. * * * P. S. If you pay out any money for notary services, I will refund it." Thereafter the corporation, at a meeting of the board of directors, regularly authorized the power of attorney as prepared by Britton & Gray to be executed; and it was duly executed and sent to Mr. Leete, who for-

warded the same to Britton & Gray; also, the application for repayment of the money. On August 29, 1895, the secretary, in reply, wrote Mr. Leete as follows: "Inclosed please find power of attorney (signed and acknowledged), Pacific Mill & Mining Company to Britton & Gray; also, an application, &c., signed by the company. Please send me your check for $5.00, expenses incurred,—notary fees and recopying power of attorney, &c." The plaintiff paid the bill for expenses.

The following letter from Leete to Britton & Gray, dated September 5, 1895, shows the steps that were taken by Mr. Leete: "In the matter of application for repayment of purchase money paid on entry of Eagle Salt mine (also called 'Eagle Salt Works'), certificate No. 170, Carson City, Nevada, bearing date 26th February, 1877: I have this day filed with the register United States land office, Carson City, Nevada, the following papers, to wit: Abstract title Eagle Salt Works; certificate certified by recorder Churchill county, Nevada; affidavit of B. F. Leete, loss of the receiver's duplicate receipt; power of attorney Pacific Mill & Mining Company to Britton & Gray; power of attorney Benjamin F. Leete to Britton & Gray; application for repayment of the purchase money by Pacific Mill & Mining Company; application for repayment of the purchase money by Benjamin F. Leete." In connection with this matter, Mr. Leete on February 6, 1896, addressed the following letter to "Pacific Mill & Mining Company—John W. Mackay, President: 19 years ago I applied to enter the Eagle Salt Works land, and paid for the land. The Pacific Mill & Mining Company owned the property in 1890. The land department canceled the entry. Last April I purchased the property from the Pacific Mill & Mining Company. There is a law of the United States prohibiting the assignment of a claim against the treasury. It is therefore necessary to present a claim for the repayment of this land money in the name of Pacific Mill & Mining Company. The department wants a quitclaim deed to the government, and the warrant on the treasury will issue in the name of Pacific Mill & Mining Company. I want the warrant indorsed to me by the Pacific Mill & Mining Company. Please order these papers executed and sent to me." No reply to this letter was ever received. Thereafter the power of attorney executed by the defendant to Britton & Gray was revoked by the order of the board of directors, and an order passed for the execution of power of attorney to H. C. King; and under that power King collected the money from the government, and paid it over to the defendant.

The following letters from the commissioner of the general land office to the register and receiver at Carson City were offered in evidence by the defendant: The first dated September 17, 1895: "Referring to your letter of the 5th inst., transmitting the application of B. F. Leete for repayment of purchase money paid on mineral entry No. 170 for the Eagle Salt Works, * * * I have to inform you that this entry was canceled by office letter M, November 7, 1890. The abstract of title submitted with said application shows that at date of cancellation the title to this land, under mineral entry No. 170, was in the Pacific Mill & Mining Company, and hence Mr. Leete was not the proper party to make application for repayment. In re Craven, 14 Land Dec. Dep. Int. 140. The application is accordingly denied." The second letter, dated December 7, 1895, reads as follows: "Referring to letter N, September 17, 1895, denying the application of B. F. Leete for repayment of purchase money paid on mineral entry No. 170, you are advised that, as no appeal was taken from said decision within the period allowed, the case has this day been closed." Testimony was offered on behalf of defendant that Mr. Wells, the vice president, Mr. Fraser, the secretary, and Mr. Walsh, a director, of the defendant, did not have knowledge of all the facts at the time defendant gave the power of attorney to Britton & Gray. The general character of this testimony is to the effect that the board of directors did not have before them at the time they authorized the power of attorney to be executed to Britton & Gray any of the correspondence "between Mr. Lyman and Mr. Leete that led to the sale of this property," and acted upon the representation made by the vice president. The vice president, Mr. Wells, with reference to the conversation between himself and the plaintiff, and as to what was considered at the time the power of attorney

88 F.—61

to Britton & Gray was authorized, testified that Mr. Lyman brought Mr. Leete to him, and introduced him, "and, as addressing me· in the absence of Mr. Mackay, he said, 'You are the vice president of this company, and Mr. Leete wants to get some money,' or 'Mr. Leete will explain to you what he wants.' He only stayed a minute, * * * and left Mr. Leete and I together. * * * Mr. Leete said there was some amount of money—$3,200 (I did not burden my mind with the amount)—that was coming to him, because he had paid it in on some land for which the application had been canceled, and he would like to have the company assist him to get what belonged to him. I said I would be glad to do anything I could. He explained what his claim was,—by reason of a purchase made some years ago. It was money coming from the United States. Q. Did you at that time, or had you ever before at any time, seen a correspondence between Mr. Lyman and Mr. Leete with reference to this? A. I never had. * * * It was a California corporation,—held property in the state of Nevada,—and most all the business was transacted through its officers. I knew very little about the affairs of the company. Q. Were you present at the meeting of the board of directors in which those resolutions were passed, making a power of attorney to Britton & Gray? A. Yes. Q. Upon whose representation, if any one's, was that action taken? A. I acted principally in the matter, because I took it for granted what Mr. Leete told me was true. That was a corporation that had been a big corporation years and years ago, but had done very little lately,—a sort of winding it up,—and I had lost most all interest in it. Q. Did Mr. Leete present to you any papers at all in connection with the negotiations he had with Mr. Lyman? A. No. The only thing that I was emphatic about was this: He said he wanted to get a power of attorney, and produced a letter [from Britton & Gray], * * * in which they said, in order to act, it would be necessary to get a power of attorney from the Pacific Mill & Mining Company, because at the time the entry was canceled the owner must receive the money. That was the ground upon which he explained it to me, and was the ground upon which action was called for by the Pacific Mill & Mining Company. The only thing I recall, * * * and which I heard Mr. Leete use my words (and he used almost the words I used), * * * I said, 'If we have no interest in this property, and are going to help you, it must be distinctly understood we will incur no obligation by reason of their work as attorneys;' and he said, 'Well, I will see to that, and get a letter from them.' I did not say, 'We have no interest,' because I did not know it. I was taking his statement to me as true. We must be protected from any claim, because I did not want the company to pay a bill for Mr. Leete's work." Upon cross-examination he stated that he knew the transaction between Mr. Leete and the Pacific Mill & Mining Company had resulted in the purchase of the Eagle Salt Works property by Mr. Leete, and knew that that transaction had been negotiated between Mr. Lyman and Mr. Leete; that Mr. Lyman was the executive officer in the state of Nevada, and attended to that business, and he always accepted what Mr. Lyman said as conclusive in regard to it; that when Mr. Lyman brought Mr. Leete into the office he thought it was perfectly satisfactory that he should carry out Mr. Leete's desire; that he supposed that Mr. Leete was the owner of the money, and entitled to get it, and that he was perfectly willing to help him get it, provided the company would not incur indebtedness; that Mr. Leete told him he had paid the money in a transaction long ago, and since then had bought the property, and was entitled to the same.

J. D. Goodwin, for plaintiff.
W. E. F. Deal, for defendant.

HAWLEY, District Judge (after stating the facts as above). From the foregoing facts the question arises, which of the parties is entitled to the money repaid by the government after the cancellation of the entry for the Eagle Salt Works, and after the purchase of the property by the plaintiff from the defendant? The case is unique. It is sui generis. It stands alone, without any direct precedent or guide.

The general principles of law, as announced in the authorities cited by the respective counsel, do not reach the pivot of the scales by which the case is to be weighed and determined. Each party is confident, but neither has been able to make the case clear. The court enters upon the discussion with a mind free from any impression as to the merits of the case,—with the hope, however, that some beacon light as to the facts, or recognized principle of law, will be found to guide it to a correct conclusion.

The plaintiff seems to have been of the impression that he was entitled to at least one-half of the money paid to the land office of the government on account of the reservation in his deed to his brother. But it is apparent that this reservation cannot possibly be construed as having any relation whatever to that money. It had reference solely to the money and accounts in the hands of the receiver of the property, who had been appointed in a suit in the state court concerning the partnership between the plaintiff and Van Gorder. The application for the patent had not been canceled at that time, and it was not then known or suspected that it would be. If a patent had been issued after the plaintiff had conveyed his interest in the property, it would have inured to the benefit of his grantee. The cancellation of the entry was not made until 1890. At the time of the cancellation the defendant had the possessory title to the property. The plaintiff had no interest therein, or any claim thereto.

The statute authorizing the money, upon cancellation of the entry, to be repaid, provides as follows:

"Sec. 2. In all cases where homestead or timber-culture or desert land entries or other entries of public lands have heretofore or shall hereafter be canceled for conflict, or where, from any cause, the entry has been erroneously allowed and cannot be confirmed, the secretary of the interior shall cause to be repaid to the person who made such entry, or to his heirs or assigns, the fees and commissions, amount of purchase money, and excesses paid upon the same upon the surrender of the duplicate receipt and the execution of a proper relinquishment of all claims to said land, whenever such entry shall have been duly canceled by the commissioner of the general land office." 1 Supp. Rev. St. 1874-81, p. 565.

If application had then been made by the defendant for the repayment of the money, it would doubtless have been paid to it, as will fully appear by reference to the letters of the commissioner of the general land office. If application had been made by the plaintiff at that time, payment would have been refused. Secretary Noble, in a letter to Comptroller Matthews in the Case of Adolph Emert, held that the only person qualified to apply for repayment under section 2 of the act of June 16, 1880, is the one in whom the title to the land is vested at the date of the cancellation of the entry, or the heirs of such party. He said:

"It is clear that after the cancellation of the entry the entryman has no right to the land that he can sell or dispose of. It is equally clear that, on the cancellation of an entry under the conditions prescribed in the statute, a claim against the government for the repayment of the purchase money and fees and commissions is created, and the statute declares that said payment shall be made to the entryman, or his heirs or assigns; but it is clear that the statute contemplated as assigns only those who became such while the entryman had an interest in the land, or, in other words, assigns prior

to the date of the cancellation of the entry." In re Emert, 14 Land Dec. Dep. Int. 101.

There is nothing in the language of the deed to furnish any light upon the transaction. There can be no question as to the legal right of the plaintiff to recover herein if from the facts it appears, either by operation of law, or by contract or agreement of the parties, that the money was to be collected by him, or by the defendant for his use and benefit. He would be entitled, if the money belonged to him, to recover it, regardless of the question whether any privity of contract existed between the parties or not, under the general principle that, in order to support an action of this character, there need be no privity of contract, except that which results from one man having another's money, which he has no right to keep. In such cases the law implies a promise that he will pay it over. Bank v. Sadler, 19 Nev. 98, 103, 6 Pac. 941, and authorities there cited; Bank of Metropolis v. First Nat. Bank of Jersey City, 19 Fed. 301, 303; Gaines v. Miller, 111 U. S. 395, 397, 4 Sup. Ct. 426; Wilson v. Turner, 164 Ill. 398, 403, 45 N. E. 820; 2 Enc. Pl. & Prac. 1017, and authorities there cited. If, however, the money did not in law belong to the plaintiff, from the mere fact that he had, in an effort to procure the title to the Eagle Salt Works, paid the same under his application for the patent, then he can only recover by showing that there is a privity of contract between him and the defendant, and that by virtue of such contract he is entitled to the money collected by the defendant. It appears from the facts that the conveyance made by the plaintiff to his brother, and by his brother to the corporation, after the money had been paid to the government, was absolute, except as to such moneys and accounts as were then in the hands of the receiver. It cannot, therefore, be legally said that the money paid to the government in the event of the cancellation of the entry should have been paid to him, simply by virtue of the fact that he had originally paid the money to the government, because, as before stated, he had in the meantime conveyed his interest in the land, without any reservation of his claim or right to this money. To enable him to recover it from the defendant, the duty devolves upon him to show that there was an agreement or contract with the defendant that he should have the money if it could be recovered from the government. What was the understanding or agreement of the respective parties in regard thereto at the time of the execution of the deed by the defendant to the plaintiff, in 1895? Was the right to the recovery of this money an element of the consideration of the sale and purchase of the land? These questions must be answered by a construction of the language of the correspondence between the parties. The correspondence commenced in the fall of 1894. In the spring of 1895 the plaintiff asked that the price for which the defendant was willing to sell the property should be named. Mr. Lyman stated generally that he thought the property could be purchased for $6,000, with certain conditions as to the delivery of salt at a certain price. This was not considered by the plaintiff as a desirable investment, at the price named, and resulted in the suggestion that the plaintiff should name the price he was willing to give, and

then for the first time a reference is made by Mr. Lyman to the money which is the subject-matter of this action:

"I have advised Messrs. Mackay and Flood [who were the principal stockholders of the defendant corporation] to sell the property for six thousand dollars; knowing the money paid the government for the land can be recovered, and assuming that the Eagle Salt Works property, with its supplies, salt on hand, etc., is worth at least three thousand dollars."

Here is a clear statement that the defendant's agent and officer knew that the money could be collected. According to Mr. Lyman's judgment, the Eagle Salt Works, with its supplies and salt on hand, was worth at least $3,000. The plaintiff, in reply, with reference to the value of the Eagle Salt Works property "depending on the recovery of the purchase money," said "that whoever recovers from the government must deed to the government, and abandon all claim to the land," and intimated that no one would be likely to do that. He then said that when he deeded the land to his brother he reserved all moneys and accounts. "If I ever owned one-half of that money, I own it now." The defendant was then put upon notice that the plaintiff claimed to be the owner and entitled to one-half of that money whether he bought the property or not. This is all that was ever said, in the correspondence, about the money. The offer that was thereafter made, and the acceptance thereof, which was satisfactory to both parties, did not make any mention of this money. The terms of the contract, in so far as this money was involved as an element of the consideration, are therefore left in an uncertain and unsatisfactory condition. Both parties had equal knowledge in regard thereto. The plaintiff claimed it, or at least one-half of it. The defendant did not deny his claim. It kept silent upon the subject. There was no specific agreement, in writing or otherwise, in regard thereto. It is apparent, however, that the plaintiff, when he made the offer of $3,500, must have understood that there was some other element of consideration besides the real value of the Eagle Salt Works and the personal property connected therewith, because he offered more than the price placed upon the property by defendant's superintendent and agent. When a man states to a prospective purchaser that certain property is worth at least $3,000, he does not expect that such person is going to offer him any more for it. The inference would seem to be that it might be purchased for a less sum. What legitimate conclusion, then, can the court draw with reference to this other element of consideration which the correspondence suggests? When Mr. Lyman explained why he advised Mackay and Flood to sell the property for $6,000, he must have meant that whoever bought the property would be entitled to receive this money from the government. This was the reason he advised the defendant to sell the property at that price. It was also an inducement to the plaintiff to offer a larger sum than the mere value of the land, and salt on hand, etc. The plaintiff, in reply, in effect said: "You are mistaken about this money. One-half of it belongs to me, whether I purchase the Eagle Salt Works property or not." This was the reason that he was unwilling to give $6,000, but was willing to give $3,500. With this understanding between the parties, the recovery of the $3,200 from the

government must have been in the minds of the parties as an element of consideration which induced the plaintiff to make the purchase. But it may be said that the difference in the price first asked and the price actually accepted tends to show that such was not the understanding of the parties. If, as suggested by Mr. Lyman, all this money would go to the purchaser, the price would reach $6,200. But he had previously offered to sell it for $6,000. If only one-half of it was to be considered, as suggested by the plaintiff, this would reduce the amount to $4,400. The collection of this money would doubtless involve expense in the employment of counsel, which would materially reduce the amount to be received. As the attorneys asked 20 per cent. to collect the money, this must be considered as a reasonable price, and would reduce the amount to $4,080. This, after deducting other expenses that had to be incurred in order to get the money from the government, would leave but a slight margin between the price first asked by Mr. Lyman and the price offered and paid by the plaintiff.

Now, with reference to the value of the Eagle Salt Works property: It appears from the testimony that the defendant was principally interested in securing for itself the delivery of salt at special rates. If this could be done, it would be willing to dispose of the property on reasonable terms, as it "had done very little" business lately, and had commenced winding up its affairs, as its officers "had lost most all interest in it." In connection with the negotiations as expressed in the correspondence, it is not difficult to see that about the only advantage to the defendant which the Eagle Salt Works property was, was that by its ownership therein it was enabled to procure salt for its own mills at four dollars per ton. True, there were "875 tons of salt on the premises, more or less"; but to realize any money from the sale and delivery of this salt by the plaintiff involved the expense of employing men to load the salt "free on board the cars," and the money was to be received in driblets, at odd times, whenever needed, within five years. The defendant, through its superintendent, said, "We do not obligate ourselves to order or to take any stated quantity of such salt." It needs no mathematical calculation to figure out the real value of this part of the contract to the plaintiff. It was more valuable to the defendant than to the plaintiff. It really constituted, as before stated, the principal value of the property to the defendant. If there was any demand for salt by other parties, it would have been of value to the plaintiff.

Take all the testimony, sift it, weigh it, test it in all of its legitimate bearings, and it becomes evident that the $3,500 was not paid by plaintiff or received by the defendant upon the understanding of either party that all that was to be received by the plaintiff was the land and salt on hand. So far as the plaintiff was concerned, he claimed one half of the money; and it must have been his understanding that, if he purchased the property from the defendant, he would be entitled to the other half. But did the other party so understand it? Did their minds meet on this proposition? So far as the express language of the letters can be construed, it is evident that both parties were trying to drive the best bargain they could. The

defendant wanted to get the highest price obtainable. The plaintiff was figuring to get the property at the lowest notch possible. From all the evidence it may be urged that neither party fully understood their respective legal rights in the premises as to the money. It is true that the court is not authorized to construe the contract so as in any manner to do violence to the language used by the parties, or to the principles of law applicable thereto; but it can and ought to give such a construction to all the negotiations as will bring the contract as near to the intention and actual meaning of the parties at the time of its execution as the words which they saw fit to employ, and rules of law, will permit. It is the duty of the court, where the language used is not clear, positive, and certain, to consult the conditions, situation, and motives of the respective parties, for the purpose of ascertaining their intention. In Rockefeller v. Merritt, 22 C. C. A. 613, 76 Fed. 909, 915, the court said:

"One of the most satisfactory tests to ascertain the true meaning of a contract is made by putting ourselves in the place of the contracting parties when it was made, and then considering, in view of all the facts and circumstances surrounding them at the time of its execution, what the parties intended by the terms of their agreement."

It has always been deemed permissible for the court to consider the conduct and acts of the contracting parties, and the interpretation which they placed upon their agreement, at the time of, or contemporaneously with, its execution, as an aid to ascertain its meaning. In Chicago v. Sheldon, 9 Wall. 50, 54, the court said:

"In cases where the language used by the parties to the contract is indefinite or ambiguous, and hence of doubtful construction, the practical interpretation by the parties themselves is entitled to great, if not controlling, influence. The interest of each generally leads him to a construction most favorable to himself, and when the difference has become serious, and beyond amicable adjustment, it can be settled only by the arbitrament of the law."

See, also, Topliff v. Topliff, 122 U. S. 121, 131, 7 Sup. Ct. 1057; Thomas v. Railway Co., 81 Fed. 911, 919; Lumber Co. v. Stump, 30 C. C. A. 260, 86 Fed. 574, 578; St. Louis Gaslight Co. v. City of St. Louis, 46 Mo. 121, 127; Mathews v. Danahy, 26 Mo. App. 660, 662; Vermont St. Church of Quincy v. Brose, 104 Ill. 208; Coal Co. v. Schneider, 163 Ill. 393, 396, 45 N. E. 126.

In Sanders v. Munson, 20 C. C. A. 581, 583, 74 Fed. 649, 651, the court said:

"Ambiguities in the terms of a contract are often dispelled by the construction which the parties themselves have placed upon the terms before controversy has arisen, and courts frequently give effect to this construction, and adopt the meaning which the parties have assumed to be correct."

As the references made to this money in the correspondence are to some extent uncertain, indefinite, and doubtful, I am of opinion that the subsequent acts and conduct of both parties, in so far as the same tend to shed light upon the transaction leading up to, and culminating in, the execution of the deed, is admissible in evidence, and should be considered by the court,—not as creating a new contract, but as tending to show what the contract and understanding

of the parties were at the time of the delivery of the deed. From the subsequent acts and conduct of the parties, it is made perfectly clear that at the time of the execution of the deed the defendant did not assert any claim to this money. Moreover, the defendant, acting through its directors, at a regular meeting authorized the execution of a power of attorney in favor of plaintiff's attorneys for the express purpose of aiding the plaintiff to get this money for himself. And it was not until it was advised from the correspondence from the land department that the plaintiff could not collect, and was not entitled to, the money, that it made any claim thereto. Upon being advised as to the rulings of the land department, it revoked its power of attorney to Britton & Gray, and authorized another attorney to act for it, who obtained the money for the defendant. The law undoubtedly protects parties acting in ignorance of their rights from imposition and deceit. But the question constantly presents itself, from all the facts herein, whether this claim thus made is one that would justify the court in holding that the defendant acted in ignorance of the facts. It seems to me that under the testimony the defendant had such knowledge of the facts before the deed was executed as required it to make inquiry as to its legal rights in the premises, and that it ought to be considered as acquiescing in the claim made by the plaintiff that he was entitled to the money, and that such was its understanding at the time the deed was executed; otherwise it would have refused to execute the power of attorney in favor of plaintiff's attorney for the purpose of enabling him to get the money. Having executed and delivered the deed to the plaintiff, and accepted the $3,500 from him, with the understanding that the plaintiff could collect, and was entitled to, this money, it ought not now be allowed to keep it on the ground that it believed at that time that the statement of the plaintiff as to his legal rights was true. In other words, while it might have been entitled to avoid the contract if there had been any misrepresentations by the plaintiff as to the material facts, by which it had been misled to its injury, it should not be permitted to do so upon the ground that it was not at the time of the execution of the deed fully advised as to the law, but acted under the belief that the plaintiff's understanding thereof was correct, especially in view of the undisputed testimony that he notified it of all the facts upon which he based his claim. It did not, after this correspondence, at any time before the execution of the deed, claim that all or any part of this money, if it made the sale, belonged to it. There was no fraud in the transaction. There was a misrepresentation as to the legal rights of the plaintiff, which the defendant accepted as true without investigation. Under these circumstances, the parties must be bound by their understanding at the time the contract was executed. The modus operandi by which the money from the government was to be obtained cannot control the transaction. It has nothing to do with it. When the sale was made, it was the understanding of the parties that the plaintiff was entitled to this money, as between the plaintiff and the defendant. The fact that it afterwards transpired—what the parties ought to have known before—that the money could only be obtained upon the application of the

defendant does not have the effect to in any manner change the contract made by the parties.

But, if it should be conceded that the defendant did not understand the contract as above interpreted, there is still another view of the case which would perhaps be binding upon the defendant, and reach the same result. It is evident from all the facts that plaintiff did so understand it. His claim to the money was not based on legal grounds; but he claimed it, and his conduct shows he was acting on the belief that he would get not only one-half of it, but, if he purchased the property mentioned in the deed, he would get it all. That was his understanding, and was a part of the consideration that induced him to offer, and, upon the acceptance of his offer, to pay, to the defendant the sum of $3,500 upon the execution and delivery of the deed to him. The defendant knew that this was his understanding, and, having accepted the $3,500 without any denial of the plaintiff's right to recover the money then in the hands of the government, it ought not to be allowed now to retain this money because the government declined to pay the money upon the application of the plaintiff, and did pay the money to it upon its own application therefor. In Cunningham v. Patrick, 136 Mo. 621, 632, 37 S. W. 817, which involved the construction of certain letters, as to whether or not the parties had adjusted the accounts between them, and agreed upon a certain sum which was to be paid by the defendant to the plaintiffs in settlement of the same, the court, instead of confining itself to the proposition that the correspondence clearly showed that both parties fully understood that the amount sued for upon the adjustment was the amount agreed upon by them as expressed in their letters, as it might well have done, treated the language of defendant's reply to plaintiffs' letters as being so qualified or indefinite as not to justify the statement that the minds of the parties met, discussed the effect of all the negotiations, and came to the conclusion that all the evidence clearly manifested what the plaintiffs' understanding of the agreement of settlement was, and that defendant having induced the plaintiffs to forbear bringing suit, upon having, as understood by them, a contract for a fixed and definite sum, the defendant should not be allowed to say that there was no such contract. In the course of the opinion the court said:

"The books abound with authority that when one of two parties has a perfect understanding of the understanding of the other as to the meaning of the terms of a contract or proposition of settlement that may be doubtful, the one knowing the understanding of the other, * * * and allowing that other to act on that understanding to his loss or injury, will be estopped from denying there was such an understanding or agreement between them, or that the minds of the two did not meet. In such cases the understanding of one, with the knowledge of that understanding by the other, will be treated as the understanding of both."

See, also, Goulding v. Hammond, 49 Fed. 443, 446; Garrison v. U. S., 7 Wall. 688.

In view of all the facts, the situation and knowledge of the parties, their surrounding circumstances, the objects which they had in view, their conduct and acts immediately after as well as before the execution of the deed, as herein interpreted, it follows that the doubts

existing in my mind as to the true meaning of the contract as exhibited by the correspondence have been solved; and my conclusion is that the money collected by the defendant from the government belongs, by virtue of the contract between the parties. to the plaintiff. Let judgment be entered in his favor, with costs.